Date signed March 28, 2008



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| KENNETH WAYNE LAURIE | * | Case No. 04-35709-NVA |
| Debtor | * | (Chapter 7) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| JANET M. NESSE, TRUSTEE | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Adversary No. 05-01343 |
| LISBETH K. LAURIE, | * | |
| and | * | |
| KENNETH WAYNE LAURIE | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| JANET M. NESSE, TRUSTEE | * | |
| | * | |
| Plaintiff, | * | |

1

v.                                                    Adversary No. 05-01347

                                          *

JUDY F. LAURIE,

                                          *

and

                                          *

KENNETH WAYNE LAURIE

                                          *

          Defendants

*     *     *     *     *     *     *     *     *     *     *     *     *

MIE PROPERTIES, INC.                       *

                                          *

          Plaintiff,

                                          *

v.                                                    Adversary No. 05-01239

                                          *

KENNETH WAYNE LAURIE

                                          *

          Defendant

*     *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING
## DEBTOR A DISCHARGE AND AVOIDING TRANSFERS OF PROPERTY

A consolidated trial was held on three adversary proceedings brought against the debtor,

Kenneth Wayne Laurie (the "Debtor"), his wife and his mother as follows: (i) a complaint brought

by Janet M. Nesse, the Chapter 7 Trustee (the "Trustee") in adversary case no. 05-01343 in which

the Trustee, pursuant to § 544 of the Bankruptcy Code seeks to utilize substantive Maryland

fraudulent conveyance law to avoid a pre-petition transfer from the Debtor individually to the

Debtor and Lisbeth K. Laurie, his wife ("Lisbeth") as tenants by the entireties, (ii) a complaint by

the Trustee in adversary case no. 05-01347 in which the Trustee, pursuant to § 544 of the

Bankruptcy Code seeks to utilize substantive Maryland fraudulent conveyance law to avoid a pre-

2

petition transfer from the Debtor and Judy F. Laurie ("Judy"), his mother to Judy individually, or, in the alternative, for the entry of a judgment in an amount of at least $100,000 and (iii) a complaint in adversary case no. 05-01239 by MIE Properties, Inc. ("MIE") a creditor of the Debtor, objecting to the Debtor's discharge pursuant to Bankruptcy Code §§ 727 (a) (2), (4) and (5). The Court conducted the consolidated trial of the three adversary proceedings on October 24, 2005 and May 1, 2006.[1]

### Facts Common to All Adversary Proceedings

On November 12, 2004, the Debtor filed a petition for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). At trial, the Debtor testified that his disputes with MIE precipitated his bankruptcy filing. (Tr. 5.1.06 at 142). The Debtor is a businessman who is involved in the ownership and operation of several gyms in the greater Baltimore area. As part of this general business enterprise, the Debtor is the president of Eastern Fitness, Inc. ("Eastern Fitness"). The Debtor testified that his business plan was to have Eastern Fitness open a World Gym franchise, a health and fitness center, at the property located at 4801 Telsa Drive, suites J - M, Bowie, Maryland. (Tr. 5.21.06 at 118). In this regard, on March 25, 2003,the Debtor, as president of Eastern Fitness, signed a ten-year lease for commercial property pursuant to which Eastern Fitness was the tenant and MIE was the landlord (the "Lease"). (MIE's Exhibit 1). The Debtor executed and delivered to MIE a personal guaranty of the Lease. *Id*. The monthly rental obligation under the Lease was $8,000.00. *Id*. The ten-year Lease was to commence on July 1, 2003. *Id*.

On June 27, 2003, the Debtor advised MIE that Eastern Fitness would not occupy the premises subject to the Lease. (MIE's Exhibit 6). The Debtor testified that he did not go forward

---

[1] References to the trial transcripts are (Tr. 10.24.05 at __ and Tr. 5.1.06 at __)

with the Lease because he was not able to obtain the funding to construct the interior finish of the premises. (Tr. 10.24.05 at 51). MIE advised the Debtor, by letter dated June 27, 2003, that he was responsible for all obligations under the Lease effective July 1, 2003. (MIE Exhibit 7; Defendants' Exhibit 10). On September 8, 2003, MIE filed an action for breach of contract against Eastern Fitness, as well as the Debtor personally, in the Circuit Court for Baltimore County. (MIE Exhibit 10). The Debtor was served with process on September 29, 2003. Although the Debtor testified that he couldn't recall when he learned about MIE's lawsuit against him, he thought it was in October of 2003, or at least the "later part." (Tr. 5.1.06 at 138). Notwithstanding, the Debtor testified that he was aware of his ten-year obligation to MIE as of the date he informed MIE that he would not occupy the space. (Tr. 5.1.06 at 158). MIE did not lead the Debtor to believe that his rental obligations would be forgiven; MIE told the Debtor that it would pursue him for the claim. (*Id*. at 159). The Debtor filed his Chapter 7 petition three days prior to the date that the MIE claim was scheduled to go to trial in Baltimore County. (MIE Exhibit 37; Tr. 1.24.05 at 64)

MIE filed claim no. 1 in the Debtor's bankruptcy case. The Debtor alleges that MIE breached its obligations under the Lease by failing to obtain the necessary zoning waivers and permits from the county and, therefore, the Debtor was not obligated on the Lease going forward. (Tr. 5.1.06 at 125 - 129; Defendants' Exhibits 1 - 3). After a prior hearing conducted in this case, the Court concluded that MIE is entitled to an allowed claim in the amount of $138,983.16 and entered an order to this effect on January 18, 2006 [45]. The validity of MIE's claim is law of the case and has thus been conclusively established.

The Debtor testified that prior to his decision to file bankruptcy, all of his creditors had been paid. (Tr. 5.1.06 at 142). In fact, MIE was his only outstanding creditor and it was the Debtor's lack

4

of available resources to fight MIE's claim that precipitated his bankruptcy filing.  *Id*.

      1.    <u>The Chesapeake Beach Property</u>

The Debtor and his mother, Judy, jointly owned property located at 7972 Delores Court, Chesapeake Beach, Maryland (the "Chesapeake Beach Property").  Judy bought this property with the proceeds of her late husband's estate and testified that she put her son's name on the title when she originally settled on the property.  (Tr. 5.1.06 at 85).  On September 29, 2003, the same day that the Debtor was served with process of the MIE suit in Baltimore County, the Debtor recorded a deed transferring his ownership of the Chesapeake Beach property to Judy individually.  At all times prior to this transfer, the Debtor and his mother owned the Chesapeake Beach Property jointly.

The deed transferring the Debtor's ownership interest to his mother was dated June 25, 2003, but was not signed by both parties and recorded until September 22, 2003 and September 29, 2003 respectively.  No consideration was exchanged for the transfer of the Chesapeake Beach Property from the Debtor and Judy to Judy individually.  The value of the Chesapeake Beach Property at the time of the transfer was at least $191,000.  (Defendants' Exhibits 20, 23).  Judy testified that there was only one lien on the property - - a deed of trust in favor of Countrywide in the amount of approximately $80,000.  (Tr. 5.1.06 at 86).  Notwithstanding, there was no direct evidence as to the amount of available equity (*i.e.* the value of the Debtor's interest) in the Chesapeake Beach Property at the time of the transfer.[2]

---

[2] There is a Uniform Residential Loan Application that Judy Laurie did not execute for the refinance of the Chesapeake Beach Property dated June 25, 2003 that states that the existing liens on the property are $83,802.  *See* Defendants' Exhibit 11.  If reduced to judgment, therefore, the value of the Trustee's avoided interest based on these facts is no more than $53,599.00.  *See, In re Reed*, 89 B. R. 100 (Bankr. C.D. Ca. 1988) (where debtor owns property as joint tenants, only 50% of value of property comes into estate).

The Debtor makes much of the fact that he made no monetary contributions toward the purchase of the Chesapeake Beach Property nor, he testified, did he make any mortgage payments for the Chesapeake Beach Property. (Tr. 5.1.06 87 - 88, 140). The Court does not believe that these facts diminish the Debtor's ownership interest in the Chesapeake Beach Property. Prior to the transfer of the Chesapeake Beach Property, the Debtor undisputedly had an ownership interest in the property irrespective of how he acquired that interest. The Debtor's interest was available for attachment by creditors. The Debtor acknowledged his ownership in the Chesapeake Beach Property and its availability to satisfy creditors when he put it up for security on his guaranty to MIE. (Tr. 5.1.06 at 156).

On June 25, 2003, Judy refinanced the Chesapeake Beach Property, and, at that time, the Debtor transferred his interest in the jointly-titled property to his mother individually. Both the Debtor and Judy testified that the Debtor divested himself of his interest in the Chesapeake Beach Property for Judy's estate planning purposes - - that Judy's younger son was coming of age and she thought it appropriate that both sons should take equally under a will. (Tr. 5.1.06 at 87 - 88)

The Debtor disputes that the Chesapeake Beach Property was conveyed without fair consideration and that he was rendered insolvent by the conveyance. He argues that he held only bare legal title to the property, and that Judy included him on the deed for "her own security" after her husband died.

Judy testified that her son's financial difficulties and his disputes with MIE did not contribute to her decision to take the Debtor off the deed of the Chesapeake Beach Property. At one point, Judy testified that she had no knowledge of her son's financial difficulties at the time that she removed her son from the title of the Chesapeake Beach Property. (Tr. 5.1.06 at 167). (At another

6

point, she testified that she knew that there was some trouble between the Debtor and MIE around the time of the transfer. *See infra*).   Instead, she insisted, the Debtor's removal from the deed was an estate planning device  when she refinanced the property.  The Court believes that Judy was motivated to protect her younger son and to preserve the equity in the Chesapeake Beach Property. However, she cannot be permitted to do this at the expense of the Debtor's existing creditors to whom the equity in the Chesapeake Beach Property had already been pledged.

The Trustee's Complaint seeks a determination that the transfer of the Chesapeake Beach property from joint ownership between the Debtor and the Defendant to sole ownership by the Defendant was a fraudulent transfer and should be avoided and turned over to the Trustee pursuant to Maryland Code Sections 15-204 and 15-207 and 11 U.S.C. § 544.

### 2.   The Waldorf Property

The Debtor and Lisbeth currently own, as tenants by the entireties, residential real property located at 15725 Hens Rest Lane, Waldorf, Maryland (the "Waldorf Property").   The Debtor purchased the Waldorf property individually in his own name in June, 2000. (Tr. 5.1.06 at 136)  On November 3, 2003, the Debtor transferred ownership of the Waldorf Property from himself, individually, to himself and Lisbeth as tenants by the entireties for no consideration.  At the time of the transfer, the value of the property was approximately $505,000.00 (MIE's Exhibit 37).  The Debtor testified that he transferred the property to himself and Lisbeth as tenants by the entireties because his wife was expecting a baby and she wanted protection for herself and her soon-to-be born child.  (Tr. 5.1.06 at 161).  The Debtor testified that at the time he transferred the Waldorf property, he had did not know  he was going to be sued by MIE or that he was going to file for bankruptcy protection.  (Tr. 5.1.06 at 137 - 38).

7

On August 16, 2004, the Debtor and Lisbeth executed a Deed of Trust in the amount of $188,000 through C&F Mortgage Corporation secured by the Waldorf Property. *See* MIE Exhibit 13. An appraisal performed in conjunction with this refinance estimates the value of the Waldorf Property as $505,000. (Defendants' Exhibit 16) Although the Debtor attempted to distance himself from this transaction and testified that it was Lisbeth's decision and that the proceeds belonged solely to Lisbeth, both the Debtor and Lisbeth were obligated under the Deed of Trust (as they must have been because the property was titled as tenants by the entireties as the result of the earlier transfer).

The Debtor and Lisbeth testified that the proceeds of the refinance were used as follows: (i) $40,365.95 to pay a second mortgage on the Waldorf Property in the name of the Debtor, (ii) $11,888.00 to pay credit cards in the name of Lisbeth; (iii) $5,300 to the Debtor for use in his business, (iv) $7,000 to pay credit cards in the name of the Debtor, (v) $5,000.00 to make improvements to a room over the garage at the Waldorf Property, (vi) funds in an unspecified amount to finish the basement at the Waldorf Property, (vii) $4,000 for Lisbeth for surgery on her nose, (viii) $5,000 to re-pay a loan obtained through Lisbeth's employer's credit union, (ix) $20,000.00 to pay off Lisbeth's Mercedes automobile and (x) a loan/gift of $50,000.00 to Lisbeth's mother because "she needed money and I gave it to her." (Tr. 5.1.06 at 39-62, 139). Later, Lisbeth admitted that she believed that her mother used the $50,000 gift from Lisbeth and the Debtor to pay off her own mortgage. (Tr. 5.1.06 at 61). As to the rest of the money that Lisbeth and the Debtor received from the refinancing of the Waldorf Property, Lisbeth had no specific recollection but testified that she spent the balance of the proceeds of the refinancing at her discretion stating, "I just buy whatever I felt like..." *Id*. at 57.

8

The Debtor testified that at the time he refinanced the Waldorf Property with his wife in August, 2004, he was aware that he was accruing liability to MIE at the rate of $8,000 per month as of July, 2003. (Tr. 5.1.06 at 106, 110).  Only ten days after the refinance, on August 26, 2004, the Debtor further encumbered the Waldorf Property by pledging it to secure an indemnity deed of trust as security for a loan from BB&T to Eastern Fitness Express, LLC, another similarly-named business owned by the Debtor, in the amount of $150,000. (Trustee's Exhibit 8).  The Debtor did not disclose to BB&T that he had refinanced the house within the past ten days and taken $188,000.00 of equity from it. (Tr. 5.1.06 at 151).

### Avoidance of Transfers Under Maryland State Law

The Maryland Uniform Fraudulent Conveyance Act, Md. Code Ann. Comm. Law §§ 15-204 - 207 permits the Trustee to recover transfers to the extent that they are fraudulent in accordance with the criteria enumerated under Maryland statute.  *See id*.  In turn, this statutory scheme, among others, is incorporated into the arsenal of the Trustee's avoidance powers under § 544 of the Bankruptcy Code.  *See In re International Loan Network, Inc.,* 160 B.R. 1, 17 (Bankr. D.D.C. 1993) ("Section 544 (b) authorizes the trustee to avoid 'any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title…'").

While there are certain  similarities between a state-law based fraudulent conveyance action and a fraudulent transfer cause of action available under §548 of the Bankruptcy Code, the "look back" period under Maryland law is effectively three years instead of one year under bankruptcy

law. *Compare* Md. Code Courts & Jud. Proc. § 5-101*with* § 548 of the Bankruptcy Code.[3] As stated

earlier, the Trustee has elected to proceed in these cases under Maryland state law.[4]

        1.    <u>Maryland Code, Commercial Law § 15-204</u>

Maryland Code, Commercial Law § 15-204 states, "[e]very conveyance made and every

obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors

without regard to his actual intent, if the conveyance is incurred without fair consideration."

Under Maryland law, an individual is insolvent if "the present fair market value of his assets

is less than the amount required to pay his probable liability on his existing debts as they become

due." Md. Code Comm. Law Ann. § 15-202.

The Debtor and Lisbeth argue that the creation of a tenancy by the entireties in favor of

Lisbeth was to protect the newly-married Debtor and his soon-to-be-born son. There is no

contention that there was any consideration paid for this transfer. However honorable these

---

[3] The "look-back" period is not to be confused with the statute of limitations. Once a bankruptcy petition is filed, the Trustee is governed by the applicable bankruptcy limitations period contained in § 546 to bring § 544 actions (incorporating state law) as well as § 548 actions (setting forth substantive bankruptcy fraudulent transfer law, including the applicable look-back period). While Maryland law does not contain a look-back period on the face of the fraudulent conveyance statutory scheme, its limitations period becomes engrafted as the applicable look-back period by virtue of § 108 of the Bankruptcy Code which tolls all causes of action upon filing.

[4] The Trustee seeks to amend [62] her complaint to add a cause of action to avoid the transfer of the Waldorf Property under Md. Code Family Law § 4-301(d)(2)(i). Although the Trustee's Motion to Amend was filed post-trial, she first raised this issue in her motion for summary judgment, and also announced on the first day of trial that she would move to amend her complaint at the close of the evidence. Thus, the Court does not believe that allowance of this amendment is prejudicial to the Defendants. In addition, this cause of action adds no new factual allegations to the complaint and arises out of the same facts that were presented at trial. Accordingly, the Court believes that resolution on the merits of this cause of action is appropriate and grants the motion to amend the complaint. *See Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980). Therefore, as an alternative basis for relief, the Court finds that the transfer of the Waldorf Property is avoidable under Md. Code Family Law § 4-301(d)(2)(i) because it was it was a transfer between spouses that was made in prejudice of the rights of present creditors, including the rights of MIE. *See infra.*

10

intentions may be in the usual circumstances, it is well-settled that "during insolvency entireties estates cannot be created or enhanced at the expense of creditors." *In re Greenfield,* 249 B.R. 856, 859 (Bankr. E.D. Mich. 2000).   In a similar vein, the Debtor and his mother argue that the refinancing of the Chesapeake Beach Property (and the divestiture of title from the Debtor) was done to accomplish Judy's estate planning goals with respect to both of her children, including the Debtor's younger brother Kevin, who was about to come of age.  Like the Waldorf Property, there is no allegation by any party that there was any consideration for the transfer of 100% of the interest in the Chesapeake Beach Property to Judy.  Having proved that there was no consideration for these gifts, the burden then shifted to Kenneth to show that he had sufficient remaining assets available to pay all of his creditors, including MIE. *See Lacey v. Van Royen*, 259 Md. 80, 94 (1970) ("[T]his case was brought to set aside a deed and bill of sale made by [the debtor] to his wife...being...without consideration, and made when [the debtor] so indebted, their legal effect, without charging they were made with such actual intent, was to delay, hinder and defraud his creditors.... The legal effect of such a conveyance is, that, without reference to the actual intent of the debtor, it is prima facie in fraud of creditors. This presumption of law may be repelled by proving that the grantor, at the time of the gift, was possessed of other means amply sufficient to pay all his debts, and the onus of so proving is upon those seeking to uphold the gift.") (internal citation omitted).

The problem with the Debtor's avowed protections for family members is that they came at the expense of an existing creditor, MIE.  Both the Chesapeake Beach Property and the Waldorf Property were pledged as collateral to secure the Debtor's personal guaranty to MIE on the Lease.  Once these properties were effectively transferred out of reach of MIE, there were no remaining assets sufficient to secure the Debtor's personal guaranty.  Neither did the Debtor have sufficient

11

income to perform his obligations under the $85,000 per year lease to MIE at the time he made the transfers to his wife and mother of his interests in the Waldorf Property and the Chesapeake Beach Property, respectively.  The Debtor testified that at the time of the transfers, his income was approximately $20,000 per year as the manager of Eastern Fitness Express.  (Tr. 10.24.05 at 83).  Even together with his wife's salary (that she could not recall) and "some savings[5]," the Debtor acknowledged that he could not afford to pay $8,000 per month.  (Tr. 10.24.05 at 84).  This is a sufficient basis to establish that the transfer of the Chesapeake Beach Property and the Waldorf Property were made while the Debtor were insolvent, or rendered him insolvent.  *See, Lacey v. Van Royen, supra* at 94 (finding that debtor was insolvent under Maryland law where he admitted that "he was in serious financial difficulty and did not have sufficient assets to pay his debts as they matured.")

The Trustee has thus fulfilled the elements under  § 15-204 for a constructive fraudulent conveyance with respect to the Chesapeake Beach Property and the Waldorf Property in that (i) the transfers were made for no consideration and (ii) the transfers were made while the Debtor was insolvent (or they rendered him insolvent).

The Debtor makes a somewhat disingenuous argument that the transfer of the Chesapeake Beach Property from his ownership was not fraudulent as to his creditors because he still had the Waldorf Property.  This argument conveniently ignores the fact that a mere months later the Debtor undertook a similar scheme in an attempt to divest his creditors of the equity in the Waldorf Property as well.  Moreover, based on the Debtor's timing and his pattern of actions to systematically divest

---

[5]The Debtor testified that the high water mark for his savings was approximately $70,000 and that this occurred in June 2003.  (Tr. 10.24.05 at 107 - 08).  By December of 2003, his savings were gone.  *Id.*

himself of all of the assets used to secure the personal guaranty that the Debtor executed in favor of MIE, the Court believes that a finding of actual fraud under Md. Code Comm. Law Ann. § 15-207 is warranted.  *See infra*.

      2.      <u>Maryland Code, Commercial Law § 15-207</u>

Maryland Code, Commercial Law § 15-207 states, "every conveyance made...with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud present or future creditors, is fraudulent as to both present and future creditors."  Maryland courts explicitly require that a grantee must participate in the grantor's fraudulent intent in order to vitiate a transfer. *Stratton v. Equitable Bank, N.A.,* 104 B.R. 713, 728 (D.Md.1989) , *citing*, *Beccio v. Tawnmoore Apartments*, 265 Md. 297, 299, 289 A.2d 311 (1972); *Berger v. Hi-Gear Tire & Auto Supply*, 257 Md. 470, 475, 263 A.2d 507 (1970).  The grantee need not have actual fraudulent intent; rather, it is sufficient for a grantee to have constructive fraudulent intent which has been quantified as "knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of ordinary prudence...and such inquiry would have necessarily led to a discovery of the fact with notice of which he is sought to be charged..." *Fick v. Perpetual Tire Co.*, 115 Md. App. 524, 537 -38 (1997) (internal citation omitted).

Courts also recognize that it is unlikely that an adverse party will elicit direct testimony of an intent to defraud.  Certain "badges of fraud" have been identified that are sufficient to demonstrate actual fraudulent intent.  *Id*.  These "badges of fraud" are: (i) insolvency or indebtedness of the transferor, (ii) lack of consideration for the conveyance, (iii) relationship between the transferor and the transferee; (iv) the pendency or threat of litigation, (v) secrecy or concealment, (vi) departure from usual methods of business, (vii) the transfer of the debtor's entire

estate, (viii) the reservation of a benefit to the transferor, and (ix) the retention by the debtor of the property.  *See, e.g.*, *In re Jeffrey Bigelow Design Group, Inc*., 956 F.2d 479, 483-4 (4th Cir.1992). An especially compelling badge of fraud is a transfer to a family member or other insider.  *In re Honey Creek Entertainment, Inc.,* 246 B.R. 671 (Bankr. E.D. Okla. 2000).

The requisite badges of fraud are present in this case.  On June 27, 2003, MIE wrote the Debtor a letter advising him that notwithstanding his notice of non-occupancy, that he would still be responsible for all of the rent coming due and owing under the Lease.   Within six months, the Debtor transferred his interests in two valuable pieces of real estate to his wife and to his mother. Not only would the Debtor's interest in this real estate otherwise be available to satisfy his creditors, generally, but it was specifically pledged to collateralize his personal guaranty of the Lease.  In addition, the Debtor also took disbursements in the amount of $83,000 from the Merrill Lynch accounts titled jointly in the name of the Debtor and his mother that were used to collateralize the guaranty within the two-year period prior to the Petition Date (although these are not transfers that the Trustee seeks to avoid).

On August 16, 2004, after the Waldorf Property had been successfully re-titled as tenancy by the entireties property, the Debtor and his wife applied for a cash-out refinance and took out $188,000 which was used to pay many creditors (but not MIE), and also used to make a substantial (and undisclosed) gift to the Debtor's mother-in-law in the amount of $50,000.   Oddly, these funds were taken from the Debtor's home equity to pay off the mother-in-law's mortgage.  It appears to the Court that this was a hedge of sorts - - a shifting of assets to family members to shield those assets from creditors in the event that the tenants by the entireties transfer became undone.  Then, ten days later, the Debtor pledged the Waldorf property to secure an indemnity deed of trust in favor

14

of BB&T in the amount of $150,000.  Finally, with only negligible, if any, home equity left, his wife's credit cards and automobile all paid up, the Debtor filed his bankruptcy petition on the eve of the MIE trial. In addition, Judy , the Debtor's mother, testified that she knew that the Debtor was having some trouble with MIE and was having trouble "getting into the gym," though she claimed to know very little about the nature of the problem.  (Tr. 5.1.06 at 168).  Similarly, Lisbeth, the Debtor's wife, testified that she knew that the Debtor and MIE "were having problems" at the time the deed was transferred.  (Tr. 5.1.06 at 161).

Thus, the Debtor and the transactions in which he has engaged have evidenced many of the recognized badges of fraud, including: (i) insolvency or indebtedness of the transferor, (ii) lack of consideration for the conveyance, (iii) relationship between the transferor and the transferee; (iv) the pendency or threat of litigation, and (v) secrecy or concealment.  Accordingly, the Trustee has carried her burden to demonstrate that the transfer of the Chesapeake Beach Property and the Waldorf Property are avoidable as actually fraudulent pursuant to Md. Code Comm. Law Ann. § 15-207.

## Denial of Discharge under the Bankruptcy Code

Although it states only one count, MIE's Complaint to deny the Debtor's discharge appears to be based on the alleged violation of three separate subsections of § 727 (a) of the Bankruptcy Code, the statute that governs discharge in a Chapter 7 case.  This statute provides, in relevant part:

**(a)** The Court shall grant the debtor a discharge, unless--

**(2)** the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be

transferred, removed, destroyed, mutilated, or concealed--

      (**A**) property of the debtor, within one year before the date of the filing of the petition; or

      (**B**) property of the estate, after the date of the filing of the petition;

             \*             \*             \*

(**4**) the debtor knowingly and fraudulently, in or in connection with the case--

      (**A**) made a false oath or account;

      (**B**) presented or used a false claim;

      (**C**) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

      (**D**) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(**5**) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. §§ 727 (a)(2)(4) and (5)

    1.    <u>Denial of Discharge Based on Intent to Defraud Creditors - § 727(a)(2)(A)</u>

Pursuant to § 727(a)(2)(A), a debtor may be denied a discharge if the debtor transferred property with the intent to defraud his creditors within one year of the date of filing a petition for bankruptcy. *Tavenner v. Smoot,* 257 F.3d 401, 409 (4th Cir. 2001). The burden of proof on an objection to discharge under § 727(a)(2) is preponderance of evidence. *See Grogan v. Garner*, 498

U.S. 279, 289 (1991).

Because MIE has challenged the Debtor's discharge under § 727 (a) (2), the Court must determine whether the Debtor had an actual intent to defraud his creditors. *See In re Woodfield,* 978 F.2d 516, 518 (9th Cir.1992); *In re Ford,* 53 B.R. 444, 449 (W.D.Va. 1984). The question of whether a debtor has the requisite intent is a question of fact. Because direct evidence of fraudulent intent is rare, the court can rely on certain indicia of fraud (similar to the "badges" discussed in the previous section) to determine whether a transfer was made fraudulent under Section 727: (1) lack of consideration (2) existence of family relationship, (3) retention of the property for personal use, (4) financial condition of the debtor before and after the transfer is suspicious, (5) an existence of a pattern or series of transactions after the onset of the financial difficulties or pendency of threat of suit by creditors, or (6) a suspicious chronology of events and transfers. *Woodfield,* 978 F.2d at 518-9. The presence of just one of these factors can be sufficient to support a conclusion that a transfer was fraudulently made, and, the presence of several factors "can lead inescapably to the conclusion that the debtor possessed the requisite intent." *In re Sandoval* 1998 WL 497475, 2 (4th Cir. 1998) (citing *In re Penner,* 107 B.R. 171, 175 (Bankr.N.D.Ind.1989).

On August 16, 2004, within one year of his bankruptcy petition date, the Debtor obtained a cash-out refinance and drained $188,000 of equity from his residence. That equity had been pledged to collateralize an indemnity deed of trust in favor of MIE. Instead, the Debtor and his wife went on a veritable spending spree with the equity, and used it to re-model their home, pay off the wife's Mercedes automobile, gift $50,000 to the Debtor's mother-in-law and whatever else the Debtor's wife "felt like" buying. The Debtor's behavior in this instance goes far beyond exemption planning. See, e.g., In re Beverly, 374 B.R. 221, 245 (9th Cir. B.A.P. 2007) (denying debtor a

17

discharge based on suspicious timing of transformation of property from non-exempt to exempt status and re-affirming the principle that, "when a pig becomes a hog it is slaughtered." This Court has already determined that the Debtor's course of conduct was fraudulent based on the circumstances and the timing of the Debtor's actions and reaches this conclusion again in making its determination under § 727 (a) (2). Accordingly, the Debtor will be denied a discharge pursuant to § 727 (a) (2).

    2.    <u>Denial of Discharge Based on False Oath - § 727(a)(4)(A)</u>

In order to be denied a discharge under § 727(a)(4)(A), "the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with the intent to defraud." *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 251 (4th Cir.1987). Whether the debtor had the intent to defraud or deceive is a question of fact that the bankruptcy judge must ascertain from the facts and circumstances of the case. *Id.* *See also, Matter of Beaubouef,* 966 F.2d 174, 178 (5th Cir. 1992) (In § 727(a)(4)(A) action, burden is on the plaintiff to prove that: (1) debtor made a statement under oath; (2) the statement was false; (3) debtor knew the statement was false; (4) debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case). These elements must be proven by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279 (1991). False oaths sufficient to justify the denial of discharge include (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings. *Beaubouef* at 178.

The purpose of this provision is to insure that debtors provide reliable information to those with an interest in the administration of the debtor's estate. *In re Kimberly Slatterly,* 333 B.R. 340 (D. Md. 2005). The subject matter of a false oath is "material" and thus sufficient to bar a debtor's

discharge, if it bears a relationship to the debtor's business transactions or estate, concerns the discovery of assets, business dealings, or the existence or disposition of property. *In re Greens*, 202 B.R. 68 (D. Md. 1996). A material misrepresentation can occur either by omission or commission. *Id.*

MIE argues that the Debtor did not disclose a 33 1/3 % interest in DJK Fitness, LLC ("DJK") on his schedule B, and that this omission was a willful and false statement. At trial, the Debtor admitted that he had an interest in DJK, an LLC formed to operate a gym in the greater Baltimore area (the "K" in DJK being for "Kenneth") and that DJK owns equipment with a value of approximately $150,000. (Tr. 10.24.05 at 83) MIE alleges that based on the value of the underlying equipment owned by DJK, that the value of the Debtor's interest in DJK is $50,000.

Similarly, MIE alleges a violation of § 727 (a)(4)(A) based on the Debtor's misrepresentation of the value of his interest in Eastern Fitness Express. The Debtor valued this entity at $0 in his schedules, yet testified that he purchased the business for $350,000 in November, 2002. (Tr. 10.24.05 at 79-80). The Debtor also testified that nothing occurred between the time he purchased the business and the date he filed bankruptcy to decrease the value of the business. (*Id*. at 81). In fact, based on the Debtor's testimony, the value of his interest in the business increased immediately prior to the petition date because he made a payment to in September, 2004 in the amount of $98,690.86 to pay off the balances owed for the business and equipment. (Tr. 10.24.05 at 66-69). The analog to this failure is that the Debtor failed to mention the obligation to BB&T in the amount of $150,000. Had this obligation been stated, of course, it would have led the Trustee simply and easily back to the proceeds from the loan and the Debtor's attempt to shift his assets from home equity into corporate holdings on the eve of bankruptcy.

19

The Debtor's schedules and statements of financial affairs are replete with additional omissions. A glaring omission is the $50,000 that the Debtor gifted to his mother-in-law within one year of the Petition Date from the proceeds of the cash-out refinance on August 16, 2004. The Debtor also omitted the $5,400 in payments made to his own mother, Judy, within the one year immediately preceding the filing of the petition.[6] There was additional testimony that the Debtor paid approximately $45,000 during the year prior to his bankruptcy filing to an entity involved in the health club business and known as Full Blown, Inc. The Debtor's testimony was not entirely clear as to whether this money was intended to be a loan to this entity, or whether it was made to obtain an interest in this entity. Nevertheless, this transaction was not reflected on the Debtor's schedules and statements as either an account receivable or an ownership interest. Neither did the Debtor list accounts at Merrill Lynch in which he held, at least, bare title. While the Debtor and his mother testified that the securities in those accounts were under the control of the Debtor's mother and that she made all of the decisions concerning those accounts, the Debtor received significant disbursements from those accounts (in the amount of $82,000.00) in the two-year prior to his bankruptcy filing. (Tr. 10.24.05 at 86; Tr. 5.1.06 at 96 - 99). In addition, these accounts were used to collateralize the Debtor's guaranty in favor of MIE. (Tr. 5.1.06 at 157). The omission of even one of these interests may be enough to deny the Debtor a discharge. *See Beaubeouf, supra* (denying debtor a discharge where he failed to disclose his ownership interest in a corporation on his schedules, notwithstanding the debtor's contention that his interest had no value).

Here, there is not a single omission but a pattern of omissions and misstatements. The

---

[6] During trial, the Debtor testified that he borrowed money from his own mother whenever he needed it, without any re-payment terms as to duration or amount of payments. (Tr. 5.1.06 at 142). Between October 2003 and December 2004, the Debtor made four payments to Judy in the amount of $2,700 each as purported repayments. (Tr. 5.1.06 at 91 - 93, 91).

disclosure of the omitted assets and transactions would have led the Trustee and creditors to the discovery of assets and or the existence and disposition of the debtor's property.   The significance of the assets and transactions omitted from the schedules leads the Court to the ineluctable conclusion that the Debtor's intent was fraudulent.  *See, in re Combs*, 193 B.R. 557 (S.D. Ca. 1996) (size and status of omitted assets are factors in determining whether debtor's intent was fraudulent). The Court therefore finds , by a preponderance of the evidence, that the Debtor's schedules and statements are false and that the Debtor has failed to come forward with evidence to show that he has not committed this offense.  *See In re Renner*, 45 B.R. 414 (D. Md. 1984); *In re Mascolo*, 505 F.2d 274 (1ˢᵗ Cir. 1974).  These omissions, taken together, are more than a sufficient basis to deny the Debtor a discharge pursuant to § 727 (a)(4)(A).  Because MIE has proven conduct satisfying this subsection, the Debtor's discharge will be denied.  *Farouki v. Emirates Bank Internat'l*, 14 F.3d 244 (4ᵗʰ Cir. 1994).

       3.      Denial of Discharge Based on Failure to Explain Loss of Assets - § 727 (a)(5)

      Pursuant to § 727(a)(5) of the Bankruptcy Code, a debtor will be denied a discharge if he fails to explain satisfactorily the loss, disappearance or deficiency of assets.  See *In re Martin,* 698 F.2d 883, 886 (7th Cir.1983).  In bringing an action under this subsection, the party objecting to the discharge has the initial burden to produce evidence establishing the basis for the objection - - *e.g.*, that loss has occurred.  Once the objecting party has met this burden, the burden shifts to the debtor for an explanation of the loss or deficiency of assets.  *See In re Ottoson-King,* 3 Fed.Appx. 147, 151, 2001 WL 167147 (4ᵗʰ Cir. 2001).  *See also*, *In re Farouki,* 133 B.R. 769, 777 (Bankr.E.D.Va.1991), *aff'd* 14 F.3d 244, 251 (4th Cir.1994) ("In a proceeding involving Section 727(a)(5), the initial burden is on the party objecting to a discharge to produce evidence establishing the basis for his

objection whereupon the burden shifts to the debtor to explain satisfactorily the loss or deficiency of assets.").

The loss about which MIE complains is the $188,000 that the Debtor withdrew from the equity in his home during the one-year period prior to the date of the filing of his bankruptcy petition.  Thus, MIE has shown that a loss of assets occurred within the statutory period contemplated by § 727 (a)(5).

As to the Debtor's burden to explain the deficiency, the Debtor *did* explain the loss of assets - - he converted the equity in his home to pay off a note to one of his businesses, he made a substantial gift to his mother-in-law, he repaid a purported loan to his mother, he paid off his wife's Mercedes, he made home improvements, and he paid off his and his wife's credit cards, among other things.  *See, e.g. In re Tapp*, 339 B.R. 420 (Bankr. W.D. Kent. 2006) (for explanation of loss of assets to be satisfactory, the disposition of the assets need not be proper or meritorious); *In re Nye,* 64 B.R. 759, 762 (Bankr. E.D.N.C. 1986) ("Section 727(a)(5) requires that there be a satisfactory explanation of the loss of an asset, but does not require that the explanation be meritorious").  As stated earlier in connection with the Court's analysis of § 727(a)(2) and (4), the Debtor will be denied a discharge based on his pre-petition transactions and other transgressions.

Stated differently, although the Court does not condone the manner in which the Debtor expended $188,000 of assets prior to the filing (or the fact that it was done at all), it does not appear to the Court that the Debtor has committed the type of wrong that § 727 (a) (5) is designed to remedy.  *See, e.g.*, *In re Wasserman*, 332 B.R. 325 (Bankr. N.D. Ill. 2005) (denying debtors a discharge where debtors had only vague explanation and few documents to explain dissipation of hundreds of thousands of dollars and few assets to show for significant credit card debt); *In re*

*Shahid,* 334 B.R. 698 (B.R. N.D. Fla. 2005 2005) (denying the debtor a discharge where debtor's explanation for pre-petition dissipation of $25,000 was that he "spent it."); *In re Delancey,* 58 B.R. 762 (Bankr..S.D.N.Y.1986)(denying the debtor a discharge where debtor claimed to have sold $400,000 worth of furs, jewelry, and art work for less than $100,000 and could not explain disposition of proceeds).

Accordingly, Kenneth Wayne Laurie, the Debtor herein, will be denied a discharge.   Janet M. Nesse, the Trustee herein, will be accorded the following relief:

a.        the transfer of the Chesapeake Beach Property to Judy Laurie individually will be avoided and  judgment will enter in favor of Janet M. Nesse and against Judy Lauire and Kenneth Laurie, jointly and severally, in the amount of $53,599.00; and

b. the transfer of the Waldorf Property to Kenneth Laurie and Lisbeth Laurie as tenants by the entireties will be avoided.

A separate order will issue.

cc:    Janet M. Nesse, Esq., Trustee
       Katherine M. Sutcliffe Becker, Esq., counsel for the Trustee
       Robert S. Glushakow
       Robert L. Hanley, Jr.
       Kenneth Wayne Laurie, Debtor
       Lisbeth Laurie, Defendant
       Judy F. Laurie, Defendant
       Maria Martinez, Esq., counsel for Defendants
       Angelo I. Castelli, Esq., counsel for Defendants
       Office of the United States Trustee

**END OF MEMORANDUM**